## MONTGOMERY v TAYLOR & GASKIN, INC

1. CONTRACTS—INTENTION OF PARTIES—PUBLIC POLICY.

   The role of the court in actions *ex contractu* when the language is clear and unambiguous is basically limited to determining what the intention of the parties was from the four corners of the contract and in accordance with normal usage of the English language; except where an agreement runs afoul of the criminal law or contravenes public policy, parties normally may strike a bargain with respect to most matters.

2. CONTRACTS—FAIRNESS—CAPACITY—PRESUMPTION.

   The courts, generally, do not concern themselves with the fairness of the terms upon which the parties to a contract agreed; it is presumed that one has the capacity to enter into contractual relationships and that he will seek terms consistent with his own best interests.

3. CONTRACTS—EMPLOYMENT—INTERPRETATION.

   Neither the Court of Appeals nor a trial judge may permissibly impair the obligation under a contract which does not offend against public policy and the Court of Appeals declines to write language into an otherwise unambiguous employment contract between a company and a salesman that provides for a 1% commission on all billed sales credited to plaintiff; a trial court's "equitable division of the commission" was improper as a matter of law.

Appeal from Wayne, Neal Fitzgerald, J. Submitted Division 1 March 6, 1973, at Detroit. (Docket No. 13561.) Decided May 23, 1973.

Complaint by G. E. Montgomery against Taylor & Gaskin, Inc., for a commission due under an

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 245–248.
[2] 17 Am Jur 2d, Contracts §§ 238, 252, 254, 255.
[3] 16 Am Jur 2d, Constitutional Law §§ 450, 452.

employment contract. Judgment of no cause of action for defendant. Plaintiff appeals. Reversed with instructions.

*Morris, Stark, Rowland, Regan, Reagan & Prekel* (by *Donald E. Paquette),* for plaintiff.

*Marco, Eagan & Kennedy* (by *Michael H. Farrar),* for defendant.

Before: FITZGERALD, P. J., and BRENNAN and O'HARA,* JJ.

O'HARA, J. This is an action at law on an employment contract. Defendant is a corporation located in the City of Detroit and is in the business of constructing and installing industrial conveyors. Plaintiff is a former sales engineer for defendant company. He brought this action contending that defendant owed him the balance of a commission on the sale of an automatic cart system which plaintiff was instrumental in selling to Sears.[1] The trial judge heard the proofs and entered a judgment of no cause of action in favor of defendant corporation.

On appeal, plaintiff raises several assignments of error. In substance, they all relate to whether or not the findings of the trial judge are inconsistent with his legal conclusion.

The pertinent facts appear to be as follows: plaintiff was initially employed by defendant as a sales engineer about December, 1964. From that time to December 31, 1965, plaintiff's compensa-

---

* Former Supreme Court Justice, *sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.*

[1] Billings on the Sears, Roebuck & Co. contract totaled $2,542,427.80. Plaintiff was paid a commission totaling $12,712.14 or 1/2% of the total billings. Plaintiff claims defendant corporation is indebted to him for at least $12,600.82 more on the same contract.

tion was a salary of $1,000 per month. During the latter part of 1965 defendant's general sales manager, James Lang, submitted a standard compensation plan, the subject of the present controversy, to plaintiff and defendant's other salesmen.[2] Plaintiff testified that he had nothing to do with the terms of the contract (a base salary of $900 per month plus a 1% commission on all his orders billed by defendant to its customers);[3] that to his knowledge the contract was the product of defendant's general sales manager. He related that Lang told him that if he (plaintiff) wanted the Sears job covered under the new sales agreement he had better sign the contract. Plaintiff signed as he was directed to.

Prior to December 31, 1965, defendant's general sales manager notified plaintiff that defendant would pay him only a 1/2% commission on the Sears job instead of a full 1%. The reasons advanced as justification for this adjustment were thus stated: (a) that defendant had spent considerable money developing the Sears contract and was dealing on a tight margin so that it couldn't afford to pay the larger commission on the transaction; and (b) that the Sears contract was not solely the product of plaintiff's efforts but rather the result of a concerted effort by many of defendant's employees. Plaintiff purportedly stated to Lang that

[2] Upon commencing employment, plaintiff was not paid on a commission basis. However, he was informed at the time he was hired of a sales plan to be developed, to be effective by the end of 1965, which would provide for such commissions.

[3] The last page of this document is captioned "Sales Contract" and reads in pertinent part:

"For exclusive sales services, Taylor & Gaskin, Inc., agrees to pay a base salary to George E. Montgomery in the amount of $900.00 per month.

"Further, Taylor & Gaskin, Inc., agrees to pay a 1% commission on all billed sales credited to George E. Montgomery based on policies and procedures as outlined in the Taylor & Gaskin, Inc. Sales Manual."

he (plaintiff) would not sign away his rights on the employment contract. He also testified that he never signed a commission modification agreement.

Defendant corporation claims and the trial judge agreed that the employment contract, effective as of January 1, 1966, does not entitle plaintiff to receive a commission on the Sears job for work he did in 1965, at a time he was a salaried employee of defendant corporation. The defendant company further claims that most of plaintiff's work on that job was done prior to the contract's effective date, *i.e.,* 1966. Furthermore, it asserts that at the point in time when a sale is "booked" the engineer becomes entitled to a commission which is paid only on "billing". Thus, no commission allegedly was due plaintiff with respect to such contract since he at that time was on a straight salary basis and, moreover, the sale was incontestably booked in 1965 even though the act of billing was completed in 1966. However, since the performance by defendant of the Sears contract would necessitate the performance of some services by plaintiff after January 1, 1966, the parties supposedly made an oral agreement that plaintiff would receive a commission equal to 1/2% of the purchase price paid by Sears.

We believe that defendant's characterization of the facts does not entirely dispose of plaintiff's claimed entitlement to an additional 1/2% of commission on the Sears job, which although partially performed by plaintiff in 1965, was not billed until calendar year 1966.

The employment contract expressly states that it "cancels and supersedes any and all existing or previously effective compensation plans".[4] Plaintiff

---

[4] This portion of the standard compensation plan provides that:

also correctly notes that the employment contract literally applied to the Sears job. Even defendant's former general sales manager agreed that the commission arrangement ostensibly would encompass the Sears contract but asserted that the parties had by mutual agreement taken it outside the scope of the new compensation provisions. The learned trial judge cogently noted during the cross-examination of Lang that the written agreement says that defendant promises to pay a 1% commission on "all billed sales credited" to plaintiff. He also properly observed that it would have been an easy matter to provide in the agreement that only orders booked after 1965 were to be computed within the written plan. We note that there's nothing in the agreement which says that it is applicable only if sales are both booked and billed in the 1966 calendar year.[5] In fact, plaintiff's former superior, Lang, states that commissions are payable to salesmen, not with respect to booked sales but rather with respect to *billed* sales.[6]

"Effective *January 1, 1966*, the following compensation plan for sales engineers will apply to all Taylor & Gaskin Inc., sales engineers. *This plan cancels and supersedes any and all existing or previously effective compensation plans."* (Emphasis supplied.)

[5] Although defendant contends that the new compensation plan was not applicable to the Sears contract since the sale was not entirely consummated after January 1, 1966, its former general sales manager conceded to the trial judge that plaintiff was paid a commission on a transaction where defendant ostensibly owed him nothing. The only explanation offered for defendant's generosity was that the corporation was obligated to pay 1/2% commission since Lang had entered into such an oral agreement on behalf of defendant corporation. Yet this alleged parol agreement on December 5 or 6, 1965, would have been superseded by the written standard compensation plan which became operative on January 1, 1966.

[6] The standard compensation plan recites in pertinent part that:

"The plan is a combination of base salary plus commission on *billed* sales.

* * *

"In addition, each sales engineer will be paid a commission of 1% on all *billed* sales * * * ." (Emphasis supplied.)

Booked commission credits were merely the entries made by defendant at the time a sale was written up and served as a statement to an individual salesman with respect to commission credits booked in his favor. Only when billing took place were commissions properly payable on previously booked sales. Hence the crucial date under the contractual provisions was the date the billing process was completed. Both parties concede this was in 1966. At that time the new salary and commission plan was fully operative and plaintiff thus became entitled to receive the entire 1% commission on the Sears job.

The role of the court in actions *ex contractu*, when as here the language is clear and unambiguous, is basically limited to determining what the intention of the parties was from the four corners of the contract and in accordance with normal usage of the English language. Except where an agreement runs afoul of the criminal law or contravenes public policy, parties normally may strike a bargain with respect to most matters. Generally, courts do not concern themselves with the fairness of the terms upon which the parties agreed. It is presumed that one has the capacity to enter into contractual relationships and that he will seek terms consistent with his own best interests.

The learned and experienced trial judge came to the following conclusion as stated in his opinion:

"The division of the commission on a 50/50 basis was, in the opinion of this court, an equitable division of the commission due in this case and therefore, the court feels that the plaintiff had no legitimate claim for the other half of the 1%."

He may be right about the "equities" of this case, but this is an issue to which we feel we dare not

address ourselves, and which as a matter of law the trial court could not either. The contract does not offend against public policy. The contract was what the contract said and neither we nor the trial judge may permissibly impair the obligation thereunder.

The record is uncontroverted that defendant corporation was in the driver's seat and could, and in fact did, dictate the terms governing its employment relationship with plaintiff. It easily could have included a provision in the contract determining what compensation, if any, its salesmen would receive for transactions which bridged the period covering both the superseded and new compensation plans. It failed to do this. We decline to write language into an otherwise unambiguous contract to the effect that a sale must be both booked and billed after January 1, 1966, as a condition precedent to plaintiff's recovery of a full 1% commission on the Sears contract.

For the error of the trial judge in coming to an unsustainable legal conclusion, even though he correctly assessed the basic fact issue presented, we reverse and direct the lower court to enter a judgment for plaintiff in the amount of the remaining 1/2% commission.

Plaintiff may tax costs.

All concurred.